IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TILDEN RECREATIONAL VEHICLES, INC.,
d/b/a BOAT-N-RV SUPERSTORE, A NEW
YORK CORPORATION,

        Plaintiff,

v.

GEORGE BELAIR,

        Defendant.

CIVIL ACTION
NO. 17-1406

FILED
JUL - 9 2018
KATE BARKMAN, Clerk
By_____ Dep. Clerk

**MEMORANDUM OPINION**

Schmehl, J.

July 7, 2018

## I. INTRODUCTION

Before the Court is the motion for preliminary injunction of Plaintiff, Tilden Recreational Vehicles, Inc., d/b/a Boat-N-RV Superstore (hereinafter "BNRV") (Docket No. 2), Defendant, George Belair's, opposition thereto, as well as a response of BNRV and a reply from Defendant.

BNRV seeks a preliminary injunction to enjoin its former employee, George Belair, from continuing his employment with Chesaco RV, an alleged competitor. Having read the parties' briefing, and after an evidentiary hearing and oral argument, for the reasons that follow, I will grant the preliminary injunction.

## II. PROCEDURAL BACKGROUND

This case arises out of allegations of breach of a non-competition and confidentiality agreement by George Belair, a former employee of BNRV. BNRV filed a Complaint and Motion for Temporary Restraining Order and Preliminary Injunction

against Belair on March 29, 2017. (Dkt Nos. 1 and 2.) On the same date, this Court entered an order granting Plaintiff's Motion for Temporary Restraining Order, stating:

> Until further order of this Court, IT IS ORDERED that Defendant enjoined, preliminarily until hearing, from (1) accepting or continuing employment in regard to customer sales for Chesaco or any other competitor of BNRV within a 50 mile radius of a BNRV facility; and (2) using, relying on or disclosing to any party other than BNRV, any of BNRV's trade secrets or Confidential Information. Further, Defendant is ORDERED to: (4) return all BNRV documents, electronic or hard copy files and information, if any, that are in his possession; (5) respond to expedited discovery served upon Defendant in this action; and (6) pay Plaintiff's reasonable attorneys' fees and costs incurred in connection with its Motion.

(Dkt No. 7.) Also on March 29, 2017, this Court granted Plaintiff's Motion for Expedited Discovery. (Dkt No. 8.)

On April 26, 2017, a hearing was held to determine whether to continue the TRO. Testimony was taken and numerous exhibits were submitted into evidence. On April 28, 2017, the Court ordered that the March 29, 2017 order should continue, but permitted Defendant to work at Chesaco's Fredericksburg, Pennsylvania location. (Dkt. No. 19.) On May 12, 2017, this Court ordered that the April 28, 2017 order should remain in effect and scheduled a preliminary injunction hearing for July 7, 2017. (Dkt. No. 22.) At that July 7, 2017 hearing, additional testimony was taken and argument was heard. On August 4, 2017, this Court entered an order that the March 29, 2017 order should remain in effect, except that paragraph (e)(1) was vacated and Defendant was permitted "full and unrestricted employment opportunities with Chesaco or any other competitor of BNRV within a 50 mile radius of the BNRV facility." (Dkt. No. 44.)

On October 2, 2017, an evidentiary hearing was held to determine whether a preliminary injunction should issue. Testimony was heard and exhibits were submitted.

## III. FACTUAL BACKGROUND

BNRV hired Belair as a Product Specialist to sell recreational vehicles ("RVs") and boats to customers at its Hamburg, Pennsylvania dealership. Belair had no prior experience selling RV's, but had an associate's degree in web design from Lehigh Valley College, and a license to sell health and life insurance. (Belair dep., p. 17.) Belair interviewed with Dan Kreiger, a BNRV sales manager. (*Id.*, pp. 69-71.) Kreiger explained the different pay plans to Belair, telling him that one paid on straight commission and one paid a base salary plus commission. Kreiger told Belair that a mediocre salesman makes $60,000 a year. (*Id.*) Belair then had a second meeting at BNRV with Brenda Keefer, BNRV's Human Resources director. (*Id.*, p. 74; BNRV dep., pp. 11-12.) BNRV offered Belair the choice of pay plans, and he took the base salary plus commissions plan to give him some certainty as to his pay. (Belair dep., p. 23.) Belair understood that BNRV was not guaranteeing him any annual level of compensation. (*Id.*, pp. 76-77.) Belair then accepted employment with BNRV as a Product Specialist. (*Id.*, pp. 80-81, 96.) BNRV did not guarantee Belair a minimum level of compensation. (Kreiger dep., pp. 68-69.)

On February 24, 2016, Belair commenced employment with BNRV and entered into a Confidentiality/Non-Compete Agreement ("the Agreement"). (Belair dep., pp. 90-91; Agreement at ¶ 1.) The Agreement stated that BNRV's Confidential Information included, *inter alia*, "(1) the Company's customer lists. . . (6) Company's pricing schemes and/or plans; (7) Company's financial information; and (8) any other information about the Company, its employees, and/or its executives which is not generally known or reasonably discoverable from public sources." (Agmt, ¶ 2.) By

3

entering into the Agreement, Belair "promise[d] that he [] will not disclose or otherwise disseminate any Confidential Information to any person(s), including other employees who may not have access to the Confidential Information, who are not bound by a confidentiality agreement similar in scope to this agreement." The Agreement further provides that in the event of an alleged disclosure of Confidential Information, "Company shall be entitled to an injunction and/or restraining order to protect the Company without the need of posting any statutorily required or other bond in addition to any rights which the Company may possess at law." (Agmt, ¶¶ 4, 5.) The Agreement further stated that "[b]y signing below, you, the Employee, agree that at the end of your employment with the Company – without regard as to whether such employment was terminated voluntarily or otherwise – Employee shall not accept employment with any Company and/or establishment whose primary business is the sale and/or service of new and/or used . . . Recreational Vehicles/Camper . . . located within a fifty (50) miles radius of any of the Company's locations for a period of one (1) year . . . Employee agrees that the scope and duration of the non-competition/non-solicitation provisions are both reasonable and necessary to protect the Company." (Agmt, ¶6.)

On February 24, 2016, Belair executed the Agreement after he had an opportunity to review it and was orally told by Keefer about the Agreement's post-employment restrictions. Belair stated that Keefer "basically said I can't work at any other RV place within 50 miles for a year." (Belair dep., pp. 90-91; 7/7/17 hearing transcript, pp. 81-85.) Belair read the agreement prior to signing it and didn't have any questions for Keefer regarding its meaning. (*Id.*) At the time he signed the Agreement, Belair understood that BNRV would not hire him if he refused to sign the Agreement. (Belair dep., p. 207.)

4

Belair started work at BNRV as a Product Specialist and was required to become an expert on BNRV's products and sales procedures. (Belair dep., p. 97.) Prior to his employment at BNRV, Belair had no prior experience selling RVs, was unfamiliar with the industry, and did not know about different RV manufacturers or the features offered in different RV products. (Belair dep., pp. 67-68.) Therefore, Belair did not immediately begin to interact with customers when he started working at BNRV; rather, he spent days reviewing BNRV and manufacturer literature to learn about the industry and the products. (*Id,* pp. 100-101.) Belair also received a manual called the BNRV Way, which was developed by BNRV management and breaks down sales techniques that they have learned over time. (*Id.*, pp. 100-101, 117-118.) He also received instruction from managers and sales representatives about the different products and shadowed a sales manager so he could learn. (*Id.*, pp. 120-123.) Belair attended sales meetings at BNRV, and attended training provided by manufacturer representatives. (Belair dep., pp. 123-124.) While at BNRV, Belair learned about the pricing of RVs, the pricing differential, and that there were prices BNRV was not willing to go below in making a sale. (Id., pp. 108-109.)

In contrast, Chesaco admitted that it recruits salespeople from other dealerships because hires will already have useful knowledge of the industry and will not have to spend time in training. (Chesaco dep., pp. 60-61.) Chesaco does not have a training manual or any written training materials that it created. (*Id.*, pp. 70, 76.) Chesaco did not give Belair any training or written materials that it created to help him do his job. (Belair dep., pp. 217-218.)

5

Chesaco is located less than 10 miles from BNRV's Hamburg location. (Id., p. 96.) Chesaco also sells RVs, but due to manufacturer restrictions, BNRV and Chesaco sell different manufacturer lines of RVs. However, they often compete for the same customer. When Chesaco determined that it needed an additional sales representative, its general manager contacted a former BNRV manager to identify good sales representatives. (Chesaco dep., pp. 97, 108.) The former manager identified Belair as a potential employee, and Chesaco contacted Belair about possible employment. (Belair dep., pp. 182-183; Chesaco dep., 103.) Chesaco eventually extended a job offer to Belair in March of 2017, which he accepted.

Belair informed BNRV that he was resigning, and was presented with a copy of the Agreement that he had signed. Belair was informed that he could not accept employment with Chesaco because doing so would violate the non-compete provisions in the Agreement. (Belair dep., pp. 194-196; BNRV dep., pp. 74-75, 126-128.) Belair was told that BNRV planned to enforce the Agreement if he left to work for Chesaco. (BNRV dep., p. 129.) BNRV, in an attempt to keep Belair employed with the company, offered to pay him straight commissions, which he declined. (Belair dep., pp. 196-197; BNRV dep., 74, 126.) He started work at Chesaco on March 20, 2017, as a sales representative.

On March 22, 2017, Belair received a letter from BNRV's attorney via FedEx and email that BNRV would pursue legal action to enforce the Agreement if he continued to violate it by being employed at Chesaco. (Dkt No. 2-4, pp. 19-22.) Belair forwarded the letter to Chesaco, but did nothing else. (Belair dep., pp. 207-208.) On March 28, 2017, BNRV's attorney sent Belair another email that BNRV intended to file a lawsuit against Belair the next day, and Belair again forwarded the email to Chesaco, but took no other

6

action. (Belair dep., pp. 208-209.) BNRV initiated the instant lawsuit the next day, March 29, 2017. That same day, this Court entered a temporary restraining order enjoining Belair from working at Chesaco.

## IV. STANDARD OF REVIEW

In determining whether preliminary injunctive relief is available, four factors are considered: (1) the likelihood that BNRV will succeed on the merits; (2) the threat of irreparable harm to BNRV if an injunction is denied; (3) whether granting an injunction will result in greater harm to Belair than to BNRV; and (4) whether the public interest favors such relief. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017); *N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385–86 (3d Cir. 2012). If the moving party demonstrates that it can succeed on the merits and it will more than likely suffer harm if preliminary relief is not granted, then a court will consider and balance the remaining factors to determine if equitable relief is warranted. *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997); *Reilly*, 858 F.3d at 179.

## V. DISCUSSION

In this matter, BNRV has shown both the likelihood of success on the merits and the threat of irreparable harm. Accordingly, BNRV has established its entitlement to injunctive relief.

### 1. Likelihood of Success on the Merits

The first factor of the preliminary injunction analysis is the likelihood of success on the merits. Demonstrating a likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *Reilly*, 858

F.3d at 179. In Pennsylvania, restrictive covenants are enforceable when they are "incident to an employment relationship between the parties; the restrictions are reasonably necessary for the protection of the employer; and the restrictions are reasonably limited in duration and geographic extent." *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir. 2007) (citing *Hess v. Gebhard & Co., Inc.*, 808 A.2d 912, 917 (Pa. 2002)).

First, the Agreement signed by Belair is clearly incident to an employment relationship between the parties, and Belair does not dispute that fact. Belair also does not argue that the one-year duration and 50 mile geographic radius of the non-compete is unreasonable.[1] Instead, he focuses on the argument that the non-compete is not necessary to protect BNRV's legitimate business interests.

Pennsylvania courts consider a restrictive covenant to be "reasonably necessary for the protection of the employer" when it is tailored to protect an employer's legitimate interests. *Victaulic*, 499 F.3d at 235. The "legitimate business interests" of an employer include "trade secrets, confidential information, goodwill, unique or extraordinary skills, and specialized training." *Zambelli Fireworks Manuf. Co., Inc. v. Wood*, 592 F.3d 412, 424 (3d Cir. 2010). Goodwill includes a business's positive reputation and is considered a protectable interest even when the goodwill has been acquired through the efforts of an employee. *Wellspan Health v. Bayliss,* 869 A.2d 990, 997 (Pa. Super. 2005), citing *Hess*, 808 A.2d at 920.

---

[1] "Pennsylvania courts routinely uphold one year restrictive covenants " *Nat'l Business Servs , Inc v Wright,* 2 F.Supp.2d 701, 708 (E.D.Pa.1998). Courts also regularly enforce reasonable geographic limits in non-competes when they are related to the employee's duties and scope of work. *See Hayes v Altman*, 225 A.2d 670, 672 (Pa. 1967.)

8

BNRV claims that enforcement of Belair's covenant not to compete is necessary to protect its customer goodwill and confidential information, including product and pricing information and specialized sales and product training. Belair argues that he is not in possession of any "confidential, proprietary information or trade secret" belonging to BNRV. (Dkt. No. 14, p. 2.) He also claims that he did not receive any specialized training at BNRV.

It is evident from the record in this matter that BNRV has several protectable interests in this case. First, it has an interest in the training and development of Belair as an employee. Belair started with BNRV with no prior experience in the RV industry. BNRV has a compensation plan set up with a salary component to it because it expects that new hires will need significant training. Belair admitted that he was given time to understand BNRV's sales processes and learn about different vehicles and their features by reading brochures and studying the products so he could become knowledgeable about RVs. BNRV paid him for the time that he spent learning about the industry. BNRV provided Belair with its sales training manual, called the BNRV Way, and he received instruction from managers and senior sales representatives on differences between products, as well as shadowing a sales manager so he could learn. Belair learned from product representatives who would come to BNRV to train sales personnel, and he received material regarding the strengths and weaknesses of BNRV products as compared to competitor products.

Unlike BNRV, Chesaco hires exclusively from within the RV industry because the new hires will already have useful knowledge of the industry and will not need to spend time in training. It has no training manual and no written training materials. The

only training Chesaco provides to new hires is to have them review online product information or brochures and listen to factory representatives discuss their products. Further, Chesaco provided no training or training materials to Belair.

Courts have recognized an employer's interest in protecting its investment in employee training in cases involving restrictive covenants. *See, e.g., Victaulic*, 499 F.3d at 238 ("if Victaulic gave Tieman some sort of specialized training, it would be legitimate for it to prevent him from using that training for the benefit of its primary competitors anywhere they compete;") *see also,Certainteed Ceilings Corp. v. Aiken*, 2014 WL 5461546 (E.D. Pa. Oct. 27, 2014) (stating that Plaintiff has a legitimate business interest in the specialized sales training that it provided to its employee that can be protected by enforcing a non-compete.)

Although perhaps not the most extensive training ever provided to a new employee, BNRV did train Belair, who had no prior experience in the RV industry, in its sales methods and product information. Belair then took that training to Chesaco and applied it in his attempts to sell RVs there. As Pennsylvania law recognizes specialized training as a protectable interest worthy of enforcing a non-compete, I find that Belair's training was sufficient to arise to the level of giving BNRV a protectable interest in it.

Further, BNRV also has a protectable interest in its confidential information to which Belair was privy. While employed at BNRV, Belair had exposure to BNRV's pricing guidelines for deals, the value of a product to BNRV and general costing information. Specifically, this includes the minimum amount of profit that BNRV has to make on a deal, the actual cost to BNRV and what BNRV paid for a vehicle. Belair learned this information through regular discussions with Sales Managers during

negotiations with customers, or through reviewing BNRV invoices stored in the title office or sales profit overviews. He also regularly attended negotiations between customers and sales managers in which he would gain knowledge of pricing.

Belair met customers while employed at BNRV, gave out his cell phone number to them and allow them to contact him with RV-related issues. Belair had no prior relationship with any of these customers prior to commencing his employment at BNRV. Further, BNRV shared its confidential marketing strategies with Belair, and Belair benefitted from the relationships and customer goodwill that he developed while at BNRV. This is all confidential BNRV information that Belair had access to that creates a protectable interest. Belair focuses his argument on this issue on the fact that BNRV accidentally gave him greater access to their financial database then he should have had. However, I find that Belair had access to confidential BNRV information in addition to the information contained in the financial database, and find it irrelevant whether Belair accessed the financial database in an improper way or not.

In summary, I find that BNRV has demonstrated a likelihood of success on the merits, as the restrictions contained in Belair's non-compete are reasonably necessary for the protection of BNRV.[2]

### 2. Irreparable Harm

"Irreparable harm" is harm that cannot be easily quantified or measured for the

---

[2] Because I have concluded that BNRV has shown a likelihood of success on the merits of its breach of contract claim, I do not reach the parties' arguments regarding BNRV's claims for misappropriation of trade secrets.

11

purpose of calculation of money damages. *Nat'l Business Servs., Inc. v. Wright*, 2 F.Supp.2d 701, 709 (E.D. Pa. 1998). Specifically, interfering with customer relationships and adversely impacting customer goodwill causes irreparable harm because the damage cannot be quantified. *Quaker Chem. Co. v. Varga*, 509 F.Supp.2d 469, 478-79 (E.D. Pa. 2007.) By taking the training that he received at BNRV, as well as the confidential pricing information and customer goodwill to Chesaco, Belair is irreparably harming BNRV. Belair learned about BNRV's products, pricing strategy and other things that can be used to compete with BNRV and cause harm to it that cannot be calculated. Damage to customer relationships has been held to constitute irreparable harm. *CentiMark Corp. v. Lavine*, 2011 WL 3209106, at *4 (W.D. Pa. July 28, 2011), citing *Coventry First, LLC v. Ingrassia,* 2005 WL 1625042, at * 11 (E.D.Pa. July 11, 2005) ("[I]nterference with customer relationships satisfies the irreparable harm requirement .... Because the violation of a covenant not to compete results in interference with customer relationships causing nonquantifiable damages, such covenants are prima facie enforceable in equity.") In summary, Belair had a real opportunity to harm BNRV's legitimate business interests by working for Chesaco; therefore, BNRV has demonstrated that it will suffer irreparable harm if Belair was allowed to work for Chesaco without restriction.

### 3. Potential Harm to Belair

Belair argues that the harm a preliminary injunction would cause him outweighs any benefit that would accrue to BNRV. The issuance of a preliminary injunction would not cause Belair any legitimate injury. He was permitted to work at Chesaco's Fredericksburg location, and was not forbidden from working for Chesaco at all. Further, he could have worked for any number of car dealers in the area due to his experience in

sales. BNRV was Belair's first sales position with recreational vehicles. It is disingenuous for Belair to claim that the temporary restraining order and/or preliminary injunction limit his employment options when he had other sales opportunities nearby. Belair should not be permitted to work in a capacity that competes with BNRV due to his potential for possession of confidential information.

### 4. Injunctive Relief is in the Public Interest

Finally, injunctive relief is in the public interest because it will discourage the wrongful use of confidential information, protect legitimate business interests and prevent unlawful competition. *See Fisher Biosciences, Inc. v. Bilcare, Inc.,* 2006 WL 1517382 (E.D. Pa. May 31, 2006); *Siemens Building Technologies, Inc. v. Camacho*, 168 F.Supp.2d 425, 427 (E.D. Pa. 2001).

## V. CONCLUSION

For the foregoing reasons, it is determined that Belair was properly enjoined from employment with Chesaco from March 29, 2017, to August 4, 2017. Since the Court's Order of August 4, 2017, resolved the preliminary matter by allowing Belair to resume full-time employment with Chesaco in Hamburg, a present or future injunction in that regard is moot. However, a preliminary injunction shall be entered in this matter enforcing all other clauses contained in the Agreement until the relevant time period has expired. Further, Plaintiff shall be awarded attorneys' fees from the time of the filing of this action up to and including the July 7, 2017 hearing.